UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL WOODBERRY, <br><br>  *Plaintiff*, <br><br> v. <br><br> JAMES D. BERRY, JR., Deputy Director of Court Services and Offender Supervision Agency, <br><br> *Defendant.* | No. 18-cv-3081 (DLF) |

## MEMORANDUM OPINION

Michael Woodberry brings this Title VII action against James D. Berry, Jr., in his official capacity as Deputy Director of the Court Services and Offender Supervision Agency (CSOSA). Woodberry asserts three counts: discrimination based on race, color, and sex; a hostile work environment; and retaliation for engaging in protected activity. Before the Court is Berry's Motion to Dismiss, Dkt. 10. For the following reasons, the Court will grant in part and deny in part the motion.

**I.   BACKGROUND[1]**

Woodberry is an African American male. Am. Compl. ¶ 6, Dkt. 9. He started working at CSOSA in 2005 as a treatment specialist in the young adult department. *Id.* ¶¶ 5–6.

---

[1] Because Berry has moved to dismiss Woodberry's claims under Federal Rule of Civil Procedure 12(b)(6), the Court must treat Woodberry's "factual allegations as true . . . and must grant [him] 'the benefit of all inferences that can be derived from the facts alleged.'" *Ctr. for Responsible Sci. v. Gottlieb*, 311 F. Supp. 3d 5, 8 (D.D.C. 2018) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)).

He found early success.  From 2009 to 2013, Woodberry's ratings were among the highest compared to his peers.  *Id.* ¶ 6.  He received salary-step increases, annual bonuses, and on-the-spot bonuses in each of those years.  *Id.*  His supervisors at the time gave him outstanding reviews and recommended him as employee of the year.  *Id.*  And he received the highest rating possible—"exceeds expectations"—in multiple years before 2014.  *Id.*

The trouble began in June 2013.  That is when Sheri Lewis, an African American female, became Woodberry's direct supervisor.  *Id.* ¶ 7.  Soon after she assumed that role, Lewis forced Woodberry to visit her office so that she could tell him stories.  *Id.*  Her stories focused on past boyfriends and people she had dated who worked for CSOSA.  *Id.*  The tales included personal information about Woodberry's coworkers.  *Id.*  They happened two or three times a week and sometimes lasted several hours.  *Id.*  And they kept Woodberry from doing his work and made him feel uncomfortable.  *Id.*  Woodberry noticed that Lewis did not force the stories on the two other treatment specialists in the young adult department—Christofer Barno, a Caucasian male, and Melissa Blackwell, an African American female.  *Id.* ¶¶ 6–7.  Woodberry complained about the stories to his second-line supervisor, Rufus Felder, but Lewis kept telling them until about May 2014.  *Id.* ¶ 7.

Lewis posed other problems.  Lewis gave more work to Woodberry than she gave to Barno and Blackwell.  *Id.* ¶ 8.  In 2013, after the treatment specialists saw their caseload increase by 45 cases, Woodberry had 11 more cases than Barno and 32 more cases than Blackwell.  *Id.*  Lewis swore angrily at Woodberry.  *Id.* ¶ 9.  In September and October 2013, Lewis publicly told Woodberry that she was his "f***ing supervisor" and that he would do what she told him to do.  *Id.*  In October 2013, she cursed at him during a meeting of treatment specialists.  *Id.*  But Woodberry never heard Lewis use profanity when she spoke with other treatment specialists.  *Id.*

Woodberry clashed with Felder too.  On March 10, 2014, Woodberry and Blackwell had cut short a meeting with contractors because the contractors were unprepared for the meeting.  *Id.* ¶ 13.  Felder and Lewis reprimanded Woodberry three times for leaving the meeting early but met with Blackwell only once about it.  *Id.*  Two days later, on March 12, Felder and Lewis held an unplanned meeting with Woodberry about 30 minutes before his shift was to end.  *Id.* ¶ 14.  Woodberry told them as the meeting started that he had to leave on time so that he could see his doctor for a medication adjustment.  *Id.*  But Felder and Lewis said he could not leave and kept him for an hour after his shift had ended.  *Id.*  In the meeting they questioned, berated, and criticized Woodberry for leaving the March 10 meeting.  *Id.*  He missed his appointment, and his doctor could not adjust his medicine.  *Id.*

Woodberry's experience worsened.  On March 13, 2014, Lewis again reprimanded Woodberry based on their March 10 and March 12 interactions.  *Id.* ¶ 15.  That same day an ambulance rushed Woodberry to the hospital for "dangerously high blood sugar and blood pressure."  *Id.*  Lewis and Felder allegedly caused this medical incident by forcing Woodberry to miss his doctor's appointment the day before.  *Id.* ¶ 37.  That summer, Lewis caused Woodberry to miss another doctor's appointment.  *Id.* ¶ 15.  On another occasion, Woodberry had to leave work for an emergency medical appointment.  *Id.*  He couldn't reach Lewis before leaving but he told her secretary on his way out.  *Id.*  Lewis called Woodberry on his way to the doctor and told him that she did not authorize him to leave.  *Id.*  He explained the situation, but Lewis remained angry.  *Id.*  So he skipped the appointment and returned to work to assuage Lewis's anger.  *Id.*

At the end of June 14, 2014, Felder told Woodberry that Woodberry would be transferred from the Taylor Street location to the South Capitol location.  *Id.* ¶ 16.  Woodberry objected and suggested that other, more junior treatment specialists could transfer instead.  *Id.*  But Felder said

that the South Capitol location needed a "strong African American male presence" and so Barno and Blackwell—two of the other treatment specialists—were unsuitable. *Id.* Woodberry told Felder that suitability for a position should be based on credentials, not sex or race. *Id.* Felder told Woodberry that they would speak again before the decision became final, but they did not. *Id.* ¶¶ 16–17. Soon thereafter Woodberry learned that the transfer decision was final. *Id.* ¶ 17.

On July 3, 2014, Woodberry emailed his objections to Felder. *Id.* In his email, he told Felder that he believed a "hidden agenda" motived the transfer and asked Felder for the "truth." *Id.* ¶ 17. He objected to the transfer's abrupt nature and to the allegedly discriminatory basis for the transfer. *Id.* But he said that he was willing to transfer if he could fulfill an actual need. *Id.* He also requested that Felder delay the transfer so that he could make new childcare arrangements because the South Capitol location was farther from his son's school. *Id.* ¶ 18. Felder said no, so Woodberry requested the same from Felder's supervisor. *Id.* Woodberry does not say whether his request was granted.

Woodberry ultimately incurred some costs from the transfer. His monthly childcare and fuel expenses increased by about $1,000 per month. *Id.* He added over an hour to his commute. *Id.* And the transfer "impeded" his career. *Id.* ¶ 19. In his 10 years at Taylor Street, he had developed relationships with clients, coworkers, and community partners. *Id.* At the South Capitol location, he had to rebuild those connections. *Id.*

While Woodberry awaited his transfer, his clashes with Felder and Lewis continued. On July 10, 2014, Felder and Lewis issued a "Letter of Caution" to Woodberry based on the March 10 meeting with contractors that Woodberry and Barno had left early. *Id.* ¶ 20. The human resources department concluded that the letter was issued untimely and that the consequences Woodberry experienced after the March 10 incident appeared to be punitive rather than

corrective. *Id*. Based on this letter, Woodberry felt that Felder and Lewis could "add to his file" at any time. *Id*. ¶ 21. He was afraid to meet with Felder and Lewis alone because he felt that they treated him like a "dartboard." *Id*.

Woodberry's 2014 performance review was also contentious. On July 10, 2014, Felder and Lewis warned Woodberry not to talk with coworkers about his performance evaluation. *Id*. ¶ 22. He interpreted this to mean that Felder and Lewis planned to give him a negative review no matter how well he performed. *Id*. So he requested that John Milam, CSOSA's Deputy Associate Director, review him instead. *Id*. That did not happen. Lewis conducted his 2014 review and scored Woodberry more than 100 points lower his coworkers. *Id*. Woodberry alleges that she did so because he "spoke with coworkers regarding their reviews" and based on events that predated both the review period and the date that Lewis started supervising him. *Id*. Woodberry went from having the highest rating score among his peers to the lowest. *Id*. The rating kept him from receiving regular salary step increases and bonuses, and he became ineligible for a promotion. *Id*.

Woodberry transferred to the South Capitol location in July 2014. *Id*. ¶ 23. At about that same time, Sabrina Estes, a treatment specialist who was female, voluntarily transferred into the Taylor Street location. *Id*. Blackwell also remained at Taylor Street. *Id*.

When Woodberry arrived at the South Capitol location, he told his new supervisor, Kevin Moore, about his past Equal Employment Opportunity (EEO) activity. *Id*. ¶ 24. The two exchanged emails about Woodberry using administrative leave for EEO activities and to appeal the 2014 performance review and transfer. *Id*.

Moore soon became another source of friction. In September 2014, Woodberry was away to attend a group therapy retreat. *Id*. ¶ 25. While Woodberry was out, Moore asked

5

Woodberry's coworker about Woodberry's absence and said that Woodberry had lied on his leave request. *Id.* Moore then spoke with Felder and a third-party about this conversation. *Id.* Moore continued to ask Woodberry's coworkers about his leave use and work performance without talking to Woodberry about it. *Id.* This behavior went on until Woodberry was detailed to another department in October 2017. *Id.*

Woodberry brought this action on December 26, 2018. *See* Dkt. 1. He amended his complaint on August 8, 2019. *See* Am. Compl. His amended complaint asserts counts of discrimination (Count I), hostile work environment (Count II), and retaliation (Count III), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq. See id.* ¶¶ 26–44. Berry moved to dismiss all claims for failure to state a claim upon which relief can be granted.[2] *See* Def.'s Mem. in Supp. of Mot. to Dismiss ("Def.'s Br.") at 8, Dkt. 10-1. That motion is now ripe.

## II.   LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff's well-pleaded factual allegations are "entitled to [an] assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). And the Court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from

---

[2] In its reply, Berry included materials that arguably present matters outside the pleadings. *See* Def.'s Reply Ex. A, Dkt. 13-1; *id.* Ex. B, Dkt. 13-2. But the Court can resolve this motion without relying on these materials. The Court thus need not decide whether it may consider those materials without treating Berry's motion to dismiss as a motion for summary judgment. *See* Fed. R. Civ. P. 12(d).

the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted).

### III.   ANALYSIS

Woodberry fails to state a discrimination claim in Count I, states a hostile work environment claim in Count II, and states one, but not two, retaliation claims in Count III.

**A.   Count I: Discrimination**

Woodberry alleges two personnel actions that he believes constituted discrimination based on his race, color, and sex: his transfer to the South Capitol location and his negative 2014 performance review. Am. Compl. ¶ 30. But as currently alleged, each action lacks an essential element of a Title VII discrimination claim. The Court will dismiss Count I.

Title VII requires that all federal executive agencies make "personnel actions affecting employees . . . free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a). "Under Title VII . . . the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

*1.   Performance Review*

As currently pled, the amended complaint fails to allege that Lewis gave Woodberry a negative review *because of* his race, color, or sex. For starters, the amended complaint itself offers a legitimate, nondiscriminatory rationale for the negative review. Recall that Lewis and Felder told Woodberry not to discuss the 2014 performance evaluations with others. Am. Compl. ¶ 22. Woodberry alleges that Lewis "specifically lowered his [2014 performance] rating review *because* [he] spoke with coworkers regarding their reviews" and thus disobeyed this

instruction. *Id.* (emphasis added). That allegation is inconsistent with Woodberry's ultimate legal conclusion that his race, color, or sex caused the negative performance. *Id.* ¶ 30.

The same goes for the other allegedly problematic aspects of the review. Woodberry alleges that Lewis "cited criticisms [from] as early as April 2013" in justifying the negative rating. *Id.* ¶ 22. And he suggests that it was improper for Lewis to include these criticisms because they predated the 2014 review period and happened before Lewis became Woodberry's supervisor. *Id.* He also alleges that because he was a historically good performer and because his workload had increased in 2013, he deserved a positive review. *See id.* ¶¶ 8–12, 22; *see also* Pl.'s Opp. at 17. He might be right about all of that. But the question is not whether the review was "wise, fair, or correct." *Kelly v. Mills*, 677 F. Supp. 2d 206, 229 (D.D.C. 2010). The question is whether it was discriminatory. And these allegations do not connect Woodberry's protected characteristics to Lewis's review.

The closest Woodberry comes to adequately alleging such a connection is when he points out that his score was the lowest among his peers—a white man and a black woman. Am. Compl. ¶ 22. But here too he comes up short because he has not alleged that "all of the relevant aspects of [his] employment situation were nearly identical to those" of his peers. *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995). For all these reasons and at this time, Woodberry's amended complaint fails to state a discrete claim for discrimination based on the 2014 performance review.

    2.    *Transfer*

Woodberry's transfer to the South Capitol location was not an adverse employment action. The general rule is that a lateral transfer is not "an actionable injury" under Title VII. *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003) (quoting *Brown v. Brody*, 199 F.3d 446,

457 (D.C. Cir. 1999)).  A transfer is "lateral" if it causes "no diminution in pay or benefits." *Id.* But lateral transfers that involve "'materially adverse consequences affecting the terms, conditions, or privileges of [the plaintiff's] employment or her future employment opportunities' . . . could be considered adverse employment actions." *Id.*  The D.C. Circuit contrasts these consequences with "purely subjective injuries," which are not actionable. *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002).[3]

Woodberry does not allege that the transfer caused him to lose pay or benefits.  It was thus a lateral transfer and is actionable only if it caused materially adverse consequences. Woodberry alleges three: an increase in childcare and fuel expenses of about $1,000 per month; an hour-longer commute; and a need to rebuild certain professional relationships.  But the increased expenses and commute are too far removed from Woodberry's job to materially affect the "terms, conditions, or privileges" of his employment or his future employment opportunities. *Stewart*, 352 F.3d at 426 (quoting *Brown*, 199 F.3d at 457).

And while need to develop new relationships at the South Capitol location does relate to his job, it is not a severe enough consequence to transform a lateral transfer into a materially adverse employment action.  That consequence likely attends most lateral transfers.  To recognize it as a materially adverse consequence would be to turn the D.C. Circuit's general rule that lateral transfers are *not* actionable inside out.  Woodberry has not alleged "a significant change in his job responsibilities," a demotion, or a newfound inability to "complete his job satisfactorily." *Forkkio*, 306 F.3d at 1131.  For these reasons, the transfer was not an adverse

---

[3] Berry notes that the U.S. Solicitor General clarified last year in a Supreme Court brief that the government interprets Title VII to cover lateral transfers even when they do not involve prejudice or adversity to the employee. *See* Def.'s Br. at 13 n.4.  But the Court agrees with Berry that for now the D.C. Circuit precedent just cited forecloses this interpretation.

action for discrimination purposes, and Woodberry thus fails to state a discrete claim for discrimination based on the transfer.

### B.     Count II: Hostile Work Environment

Woodberry alleges that Lewis, Felder, and Moore created a discriminatory and retaliatory hostile work environment that "was sufficiently harassing to send him to the hospital," "impeded his ability to work," and made him "feel hopeless." Am. Compl. ¶ 37.  Because Woodberry's allegations suffice to plead a hostile work environment claim, the Court will deny Berry's motion to dismiss Count II.

To establish a hostile work environment claim, Woodberry "must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  This standard applies both to discriminatory and to retaliatory hostile work environment claims.  *See Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 79, 82–83 (D.D.C. 2013).  Courts examine the totality of the circumstances, considering among other factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Title VII is not a "general civility code"—the alleged conduct "must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted); *see also Baloch*, 550 F.3d at 1201.  The alleged conditions must be both "objectively and subjectively hostile, meaning that a reasonable person would find [the work environment] hostile or abusive, and that the victim

must subjectively perceive the environment to be abusive." *Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 237 (D.C. Cir. 2018) (alteration adopted and internal quotation marks omitted).

Woodberry has alleged workplace conduct that was subjectively and objectively abusive. There were unwanted, inappropriate stories. For nearly a year, Lewis, Woodberry's direct supervisor, forced him to visit her office to hear her tales of romantic encounters with past boyfriends. Am. Compl. ¶ 7. She sprinkled those stories with personal information about Woodberry's coworkers. *Id.* This unwanted story time lasted several hours and happened multiple times per week. *Id.* And Lewis shared these stories only with Woodberry. *Id.* ¶¶ 6–7. They kept him from doing his job and made him feel uncomfortable. *Id.* ¶ 7. Woodberry also complained about them to Felder, Lewis's supervisor, but to no avail. *Id.*

There was yelling and berating. Lewis swore angrily at Woodberry. *Id.* ¶ 9. On more than one occasion, she told him that she was his "f***ing supervisor" and that he would do what she told him to do. *Id.* And she cursed at him during meetings with his peers. *Id.* But she treated none of his peers this way. *Id.* Lewis again reported this behavior in vain to Felder. *Id.* Woodberry was afraid to meet with Felder and Lewis alone because they treated him like a "dartboard." *Id.* ¶ 21.

There was interference with medical care. Lewis and Felder knew that Woodberry suffered from various health issues because he requested an accommodation. *Id.* ¶ 10. But on multiple occasions, Woodberry alleges that they deliberately caused him to miss medical appointments. *See id.* ¶¶ 14–15. One of these missed appointments led to Woodberry being rushed to the hospital by ambulance and spending a week there to recover. *Id.* ¶ 15.

11

There was also punitive, disparate, and disproportionate reprimand.  Recall that both Woodberry and Barno left a meeting earlier than they should have.  *Id.* ¶ 13.  But while Barno received one reprimand from Lewis and Felder, Woodberry received several.  *Id.*  And Woodberry's reprimands were not run of the mill.  In one discussion, they berated him for leaving the meeting and kept him from the medical appointment that ultimately landed him in the hospital a day later.  *Id.* ¶ 14–15.  Another reprimand came as "Letter of Caution" that the human resources department concluded was untimely—having been issued four months after the relevant event—and was punitive rather than corrective.  *Id.* ¶¶ 20–21.  And as set forth in Part I above, these are not Woodberry's only hostile work environment allegations.

Viewed together, these allegations suffice to state a claim for hostile work environment based on discrimination, at least at the motion-to-dismiss stage.  First, Woodberry has said just enough to connect these allegations of abuse to his protected characteristics.  Woodberry's fundamental claim is that neither of his coworkers—a white man and a black woman—faced this treatment.  He presses an inference that his status as a black man is to blame for the environment he faced.  While ultimately it may be challenging for Woodberry to prove that claim with record evidence, he has cleared the bar for now.

Second, Woodberry has shown that the environment was sufficiently severe or pervasive to support a hostile work environment claim.  In evaluating this element, the Court has considered: how often and for how long the conduct took place; whether it happened within the actual work environment; whether it happened over multiple offices; whether it emanated from just a few individuals; whether it involved verbal or physical abuse; and whether it merely concerned advancement prospects.  *See Moore v. U.S. Dep't of State*, 351 F. Supp. 3d 76, 91–92 (D.D.C. 2019); *see also Harris*, 510 U.S. at 23.

Here, as alleged, Woodberry faced abusive conduct, including verbal assaults, in one office primarily, multiple times per week, for a discrete period of less than a year. The alleged abuse emanated from one person primarily, and, for the most part, did not concern Woodberry's advancement prospects. Based on these factors and taking every allegation of *this* amended complaint as true, Woodberry has alleged an environment that was sufficiently abusive—both subjectively and objectively—to support a hostile work environment claim based on discrimination.

That said, Woodberry has not alleged facts sufficient to support a hostile work environment claim based on retaliation. Most of the events described above happened before Woodberry first engaged in any protected activity around July 2014. *See* Am. Compl. ¶ 40; *id.* ¶ 17. The environment that Woodberry faced *after* July 2014 was not sufficiently severe or pervasive to support a hostile work environment claim based on retaliation.

Though Woodberry's hostile work environment claim survives this motion to dismiss, ultimately, he will have to support his claims with record evidence. Not only will he need to prove that the alleged abuse that forms the basis of his hostile work environment claim actually occurred, he also will have to show that discrimination based on his race, color, or sex was a motivating factor for the abuse. Casting these allegations in the light most favorable to Woodberry, his hostile work environment claim survives the motion to dismiss.

C.     **Count III: Retaliation**

Woodberry alleges that CSOSA retaliated against him for engaging in two protected activities. Am. Compl. ¶ 43. One allegation fails and one succeeds, so the Court will dismiss Count III only in part.

Title VII's antiretaliation provision prohibits an "employer" from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII]" or because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). The D.C. Circuit applies the antiretaliation provision against the federal government. *See, e.g.*, *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015).

To prove a retaliation claim, an employee "must show (1) that [the] employee engaged in statutorily protected activity; (2) that the employee suffered a materially adverse action by the employee's employer; and (3) that a causal link connects the two." *Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Emps. of Library of Cong., Inc. v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013). "To survive [a] motion to dismiss, [a] complaint must contain sufficient factual matter, accepted as true, to plausibly establish those three elements." *Id.* (internal quotation marks omitted).

Woodberry alleges two instances of retaliation. First, he alleges that he engaged in protected activity when he objected to his discriminatory transfer to the South Capitol location, Am. Compl. ¶ 40, and that Lewis retaliated by giving him a lowered 2014 performance review, *id.* ¶ 43. Second, he alleges that he engaged in protected activity when he told Moore about past EEO activity and asked about using leave to appeal the 2014 performance review and transfer, *id.* ¶ 40, and that Moore retaliated by accusing him of lying about his leave usage and regularly questioning Woodberry's coworkers about his absences and work performance, *id.* ¶ 43.

   1. *Performance Review*

Woodberry's relation claim based on his 2014 performance review states a claim for retaliation. First, his objection to the transfer was statutorily protected activity. He told Felder

14

that a vacancy should be filled based on credentials, not based on gender or race. Am. Compl. ¶ 16. He thus "oppose[d] [a] discrete practice that [he] reasonably could have believed discriminated on the basis of race, color, [or] sex." *Morris v. McCarthy*, 825 F.3d 658, 673 (D.C. Cir. 2016).

Second, the negative performance review was plainly a materially adverse action because it kept Woodberry from receiving regular salary step increases and bonuses and made him ineligible for a promotion. Am. Compl. ¶ 22; *see also* Def.'s Br. at 22–23 (not disputing this element).

And third, Woodberry has—just barely—alleged a causal link between his objection and the performance review. For retaliation claims, "causation is often the most difficult element to show in advance of discovery." *Bryant v. Pepco*, 730 F. Supp. 2d 25, 31 (D.D.C. 2010). So a plaintiff may establish the causal connection element of a retaliation claim "by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) (quoting *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985)). There is no bright-line rule for what "shortly after" means, but courts seem to have coalesced around a dividing line of three months. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (approvingly citing cases finding three- and four-month intervals insufficiently close in time); *McIntyre v. Peters*, 460 F. Supp. 2d 125, 133 (D.D.C. 2006) (collecting cases for the proposition that D.D.C. judges have "often followed a three-month rule to establish causation on the basis of temporal proximity alone").

Woodberry objected to the transfer in late June and early July 2014. Am. Compl. ¶ 16. And he appears to have received his 2014 rating in early August 2014. *See id.* ¶ 22. This period

of about one month between the protected activity and the materially adverse action is short enough to allege a causal link at the motion-to-dismiss stage.

### 2. Moore's Actions

But Woodberry's retaliation claim based on Moore's actions is insufficient. First, Woodberry has not responded to Berry's argument that there is no causal connection between Moore's alleged adverse actions and Woodberry's protected activity. See Def.'s Reply at 16. The Court treats that argument as conceded. See, e.g., *Buggs v. Powell*, 293 F. Supp. 2d 135, 141 (D.D.C. 2003).

Second, and regardless of that concession, Woodberry also has failed to allege that Moore took materially adverse actions against him. An employer's action is sufficiently adverse for a retaliation claim if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Baird v. Gotbaum*, 662 F.3d 1246, 1249 (D.C. Cir. 2011) (internal quotation omitted). Such actions "are not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* (internal quotation marks omitted). Yet "while the scope of actions covered by Title VII's substantive provision and its anti-retaliation provisions differ, the magnitude of harm that [the] plaintiff must suffer does not"—in both cases, the plaintiff must suffer "objectively tangible harm." *Hornsby v. Watt*, 217 F. Supp. 3d 58, 66 (D.D.C. 2016).

Moore's questioning of Woodberry and a few others about Woodberry's leave and work performance are not such actions. Woodberry seeks support in *Mitchell v. District of Columbia*, 304 F. Supp. 3d 110, 118 (D.D.C. 2018). But Moore's actions fall short of the publicly displayed notice on the main entrance barring an employee from entering her old facility that the court in *Mitchell* deemed materially adverse. See id. at 113, 118. They are more akin to the

"petty slights or minor annoyances that often take place at work and that all employees experience," which Title VII's antiretaliation provisions do not prevent. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Berry's Motion to Dismiss. A separate order consistent with this decision accompanies this memorandum opinion.

June 5, 2020

_____
DABNEY L. FRIEDRICH
United States District Judge