## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHAEL WOODBERRY,

            *Plaintiff*,

    v.

RICHARD S. TISCHNER, in his official capacity as Director, Court Services and Offender Supervision Agency,[1]

            *Defendant*.

No. 18-cv-3081 (DLF)

## MEMORANDUM OPINION

Michael Woodberry brings this Title VII action against Richard Tischner, the Director of the Court Services and Offender Supervision Agency. Woodberry alleges that his supervisors at the Agency both created a hostile work environment and retaliated against him for engaging in protected activity. Before the Court is the government's Motion for Summary Judgment, Dkt. 22. For the following reasons, this Court will grant that motion.

## I.    BACKGROUND

### A.    Factual Background

Woodberry, an African American male, worked as a treatment specialist in the Agency's Taylor Street location. *See* Def.'s Statement of Undisputed Material Facts (Def.'s Statement of Facts) ¶¶ 1–2, Dkt. 22-4.[2] The events relevant to this litigation began in June 2013, when Sheri

---

[1] When this complaint was filed, James Berry, Jr. was the Director of the Court Services and Offender Supervision Agency. When Richard Tischner became Director, he was substituted pursuant to Fed. R. Civ. P. 25(d).

[2] The Court cites to the defendant's Statement of Facts if a fact is undisputed. If a fact is disputed, the Court will indicate as such.

Lewis, an African American female, became his first-line supervisor.  *Id.* ¶ 3.  Shortly thereafter, Woodberry testified, Lewis began to summon him to her office to "discuss her prior relationships or current relationships."  Def.'s Mot. for Summ. J. Ex. A (Pl.'s Answers to Interrogatories), at 7, Dkt. 22-3.  Woodberry testified that these meetings occurred "two or three times a week," and that their average length was "forty minutes."  Def.'s Mot. for Summ. J. Ex. B (Pl.'s Dep), at 64–65, Dkt. 22-3.  He also testified that he viewed these meetings as mandatory.  *See id.* at 69.

Over the following year, Woodberry and Lewis became increasingly at odds.  On September 4, 2013, Lewis told Woodberry, "I'm your f***ing supervisor, and if I tell you to do it, then you do it, okay."  *See* Def.'s Statement of Facts ¶ 25.  Woodberry testified that Lewis "proceeded with some of the same behaviors" in October 2013, but "not exactly the same language."  Pl.'s Dep. at 37.  Woodberry then requested a meeting to discuss these incidents with Rufus Felder, an African American male who was his immediate supervisor.  *See id.*; Def.'s Statement of Facts ¶ 4.  In that meeting, Lewis stated that she "told [Felder] immediately" about her use of profanity.  Pl.'s Dep. at 37.  When Woodberry responded that Felder had previously told Woodberry that he had no knowledge of that use, Felder responded, "Mr. Woodberry, this is not a joke. This is serious, and, and we expect you to be respectful."  *Id.* at 37–38.

On March 10, 2014, Woodberry attended a meeting with Lewis, other Agency officials, and outside contractors.  *See* Def.'s Statement of Facts ¶ 7; *see also* Def.'s Mot. for Summ. J., Decl. of Denisha Minor-Armstead Ex. 1 (Report of Investigation), at 157–58, Dkt. 22-2.  During the meeting, Woodberry aggressively addressed one of his Agency colleagues, Def.'s Statement of Facts ¶ 8; became frustrated with the contractors, who he believed were "wasting everyone's time," *id.* ¶ 9; and "announced that [he] was leaving," *id.*  Melissa Blackwell, an African American woman whom Woodberry described as "[his] intern," left as well.  *Id.* ¶ 10.

2

On March 12, 2014, Woodberry met to discuss his above conduct with both Lewis and Felder.  *See id.* ¶ 11.  At the outset of the meeting, Woodberry noted that he felt sick and had a doctor's appointment later that day.  *See id.* ¶ 12.  During the meeting, Woodberry "became upset" and asked to leave for his appointment.  Report of Investigation at 120.[3]  Lewis and Felder required him to stay, which caused him to miss his appointment.  *See id.* at 120, 158.  The next day, Woodberry was rushed to the hospital to treat high blood pressure and low blood sugar.  *See* Def.'s Statement of Facts ¶ 14.

On July 10, 2014, Woodberry received a Letter of Caution from Lewis and Felder, which was backdated to April 11, 2014.  *See* Def.'s Statement of Facts ¶ 15.  The Letter stated that "abruptly leaving a meeting in anger without the approval of your supervisor is unacceptable." Report of Investigation at 7.  It also faulted Woodberry for "fail[ing] to take responsibility for [his] behavior" in the March 10 meeting and "blam[ing] the situation on [his] frustration."  *Id.* Finally, it advised Woodberry that "similar future incidents will not be tolerated and may result in disciplinary action being taken against you, up to and including removal."  *Id.*  Lewis eventually rescinded the Letter of Caution, after Woodberry reported the matter to the Agency's human resources department.  *See* Def.'s Statement of Facts ¶¶ 16–17.  One human resources employee explained that the recission was "based on internal procedural errors without consideration regarding the merits of the Letter of Caution."  Report of Investigation at 56.[4]  In contrast to Woodberry, Blackwell never received a Letter of Caution.  *See id.* at 67.

---

[3] Although Woodberry disputes whether he "became upset" during that meeting, *see* Pl's Statement of Disputed Material Facts (Pl.'s Statement of Facts), ¶ 13, he previously used that exact phrase to describe his reaction, *see* Report of Investigation at 120.

[4] Although Woodberry argues that there were other reasons for the recission, *see* Pl.'s Statement of Facts ¶ 18, he identifies no record evidence for his position, and there is thus no genuine dispute of material fact on the issue.  *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly

Around the same time, Felder told Woodberry that he was being transferred to the Agency's location on South Capitol Street. *See* Report of Investigation at 79, 124–25. When Woodberry objected to the transfer, Felder told him that the South Capitol office needed "a strong African American male presence." Def.'s Statement of Facts ¶ 19 (quoting Report of Investigation at 141). Woodberry responded that "race and gender [have] nothing to do with [his] employment" and that any Agency treatment specialist could do the job. Report of Investigation at 124–25. He also asked why he was being transferred instead of Chris Barno, a Caucasian treatment specialist. *Id.* at 79. In a subsequent email, Woodberry told Felder that he believed there was "more to the move and more to selecting me as the person to be moved" than Felder had let on. *Id.* at 22. He added, however, that, "[i]f there is a need for a strong black male at South Capitol for [its young adult program], I am more than willing to fulfil that need." *Id.*

On August 4, 2014, Lewis sent Woodberry his annual performance review, which assigned him 300 out of a possible 500 points. *See* Def.'s Statement of Facts ¶¶ 31–32. The performance review reached this score after describing Woodberry's strengths and weaknesses in qualitative terms, *see* Report of Investigation at 59–63, as well as incorporating a prior audit of his assessments, *id.* at 60; *see also* Woodberry's Mem. Ex. G (Additional Report Documents), at 66–82, Dkt. 23-3. Under the Agency's scale, a score of 300 translates to the descriptor, "Fully Meets Expectations." *See* Def.'s Statement of Facts ¶ 32. Woodberry had received stronger reviews in past years, including the descriptor, "Exceeded Expectations." *See* Report of Investigation at 142.

---

support an assertion of fact or fails to properly address another party's assertion of fact . . . , the court may . . . consider the fact undisputed for purposes of the motion.").

On that same day, Woodberry submitted a formal grievance regarding his performance review to John Miliam, a Deputy Associate Director at the Agency. *See id.* at 99. Following a review of Woodberry's situation, Miliam raised his total rating to 320 out of 500. *See id.* From there, Woodberry raised the issue with James Barry, the Agency's Deputy Director. *See id.* Barry concluded in a twenty-page decision that "the documentary evidence in this matter fully supports that the rating issued to [Woodberry] was fair and reasonable, and that the determination was based on supportable facts." *Id.* at 118.

In September 2014, Woodberry requested leave under the Family and Medical Leave Act, 29 U.S.C. § 2601, to attend a retreat in the Dominican Republic between September 15 and 19. *See* Def.'s Statement of Facts ¶ 22. He asserts that he sought leave because he "had become very depressed again and [because his] therapist suggested that [he] return to [an] Intensive Outpatient Program for mental support." *Id.* at 23 (citation omitted). His leave was granted by Kevin Moore, an African American male who supervised Woodberry at the Agency's South Capitol Street location. *See id.* ¶¶ 5, 24; Report of Investigation at 132. Woodberry testified that both Moore and Felder questioned Sam Castle, who worked with Woodberry at the Agency, about his reasons for taking leave. *See* Report of Investigation at 126–27. According to Woodberry, Felder said something to the effect of "I know that your boy Woodberry went on that trip with you . . . [T]ell your boy Woodberry to get his head out of his ass." *Id.* at 121. Woodberry's hearsay statement is disputed, however, as Castle testified that he does not remember discussing this matter with Felder. *See id.* at 137. Before the EEOC, Woodberry stated that he did "not believe that [] Moore's questioning was discriminatory" but that he believed Felder's questioning to be retaliatory. *Id.* at 128.

### B.    Procedural History

On August 5, 2014, Woodberry completed an intake form with the Agency's Office of Equal Employment Opportunity, Diversity and Special Programs (the "EEO Office") that raised several claims of discrimination and retaliation. *See* Report of Investigation at 65–68. These claims related to three events: first, his receiving a Letter of Caution; second, his transfer to South Capitol Street; and third, his receiving a merely adequate performance review. *See id.* at 67. The form also alleges that "the above harassment started because Mr. Felder and Ms. Lewis are trying to retaliate[] against him for reporting a prior harassment event:" specifically, Lewis' "bullying and harass[ment of] him" "on September 10, 2013." *Id.* It further provides that Woodberry "reported th[at] incident to [] Felder on or around November 10, 2013," but that Felder "did nothing." *Id.* at 67–68.

On November 3, 2014, Woodberry submitted a formal complaint with the EEO Office. *See* Def.'s Statement of Facts ¶ 37. The EEO Office acknowledged receiving that complaint on December 2 and interpreted it as stating two allegations: first, that Woodberry's transfer to the South Capitol Street location reflected "discrimination on the bases of race (black) and color (black) by [] Felder;" and, second, that his Letter of Caution reflected "discrimination on the basis of sex (male)" by Lewis. Report of Investigation at 83–84.

On November 15, Woodberry objected to the EEO Office's acknowledgement and sought to broaden the scope of his complaint. *See id.* at 87–89. In particular, he alleged that

> he was discriminated against and subjected to a hostile work environment on the basis of his race, sex and color and in reprisal for complaining of illegal discrimination when he was issued a Letter of Caution and an inaccurate and lowered final performance review, harassed about his leave requests, cursed at, and transferred to the South Capitol Street [] location.

*Id.* at 88.  Upon receipt of Woodberry's objection, the EEO Office accepted the following allegations for investigation: first, that Woodberry's transfer to the South Capitol location reflected both race-based and sex-based discrimination; second, that Woodberry's 2014 performance review reflected the same; and, third, that questioning Castle regarding Woodberry's leave was retaliation for prior EEO activity.  *See id.* at 90–91.  The EEO Office declined to investigate Lewis's prior use of profanity on the ground that the allegation was untimely.  *See id.* at 91.  It also declined to investigate the Letter of Caution on the ground that the Agency had rescinded it.  *See id.*

On May 23, 2018, the U.S. Equal Employment Opportunity Commission granted summary judgment to the Agency.  *See* Def.'s Mot. Ex. C (EEOC Opinion), Dkt. 22-3.  The EEOC found that Woodberry "failed to proffer any evidence that would show that the Agency's actions were motivated by his race, color, sex, or protected EEO activity."  *Id.* at 7.  It also found, with respect to the performance review, that Woodberry had "fail[ed] to rebut the Agency's legitimate, non-discriminatory reasons for assessing his performance and conduct in the manner it did."  *Id.*

Woodberry brought this action on December 26, 2018, Dkt. 1, then amended his complaint on August 8, 2019, Dkt. 9.  His amended complaint alleged that both his transfer to the South Capitol location and his weakened performance review constituted discrimination based on his race, color, or sex.  *See* Am. Compl. ¶¶ 26–31, Dkt. 9.  The complaint also raised a hostile work environment claim, with reference to the above actions, the Letter of Caution, and the March 12 meeting—that is, the meeting with Lewis and Felder that caused Woodberry to miss his doctor's appointment.  *See id.* ¶¶ 32–37.  Finally, the complaint alleged two counts of retaliation: first, that Felder lowered Woodberry's performance review in retaliation for his

objecting to the South Capitol transfer and, second, that Felder accused Woodberry of lying about his use of leave for the same reason. *See id.* ¶¶ 38–44.

The Agency moved to dismiss Woodberry's complaint on September 24, 2019. Dkt. 10. This Court granted that motion in part and denied it in part. *See* Mem. Op. of June 5, 2020. Specifically, it held that Woodberry failed to state a discrimination claim, successfully stated a hostile work environment claim, and stated only one retaliation claim. *See id.* at 7. The surviving retaliation claim concerned Woodberry's performance review, as opposed to his use of leave. *See id.* at 13–17.

Following discovery, the Agency moved for summary judgment on the remaining claims in this case. Dkt. 22. That motion is now ripe for review. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

## II.    LEGAL STANDARD

Under Rule 56, summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one that could affect the outcome of the lawsuit. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. In reviewing the record, the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

A party "opposing summary judgment" must "substantiate [its allegations] with evidence" that "a reasonable jury could credit in support of each essential element of [its] claims." *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015).  The moving party is entitled to summary judgment if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   ANALYSIS

The Court will grant summary judgment on Woodberry's retaliation claim because no reasonable jury could find a causal link between his protected activity and an adverse employment action.  It will also grant summary judgment on his hostile work environment claim as no reasonable jury could tie his work environment experience to his membership in a protected class.

### A.      The Retaliation Claim

Title VII's antiretaliation provision prohibits an "employer" from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII]" or because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  The D.C. Circuit applies the antiretaliation provision against the federal government.  *See, e.g.*, *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015).

"Claims of retaliation under Title VII are governed by the same *McDonnell-Douglas* burden-shifting analysis applicable to discrimination claims."  *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 574 (D.C. Cir. 2019).  Under that analysis, Woodberry bears "the initial burden of establishing a prima facie case for retaliation," which requires showing "(1) that he engaged in

statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Id.* (citation omitted).  From there, "the burden of production shifts to the defendant, who must articulate some legitimate, non-retaliatory reason for the adverse action." *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007).  Finally, if the defendant makes that showing, "the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [retaliation]." *Id.* (internal quotation marks omitted).  *Id.*; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805 (1973) (describing the defendant's proffer as "presumptively valid" at this stage).

Summary judgment is appropriate here because no reasonable jury could find a causal connection between Woodberry's protected conduct and the contents of his performance review. *See Liberty Lobby*, 477 U.S. at 248.  On that issue, Woodberry emphasizes he received his unfavorable performance review approximately one month after he objected to his transfer.  *See* Pl.'s Mem. at 28.  The government appears to stipulate that this "tight temporal proximity" is enough to meet Woodberry's burden under the first step of *McDonnell Douglas*, *Iyoha*, 927 F.3d at 574.  *See* Def.'s Reply at 15.  But "temporal proximity is not sufficient" when an "employer [has] proffer[ed] a non-retaliatory explanation for the adverse employment action," *Iyoha*, 927 F.3d at 574, as the Agency has done here.  In brief, the Agency explained that Woodberry's performance review incorporates formal audits of his work, *see* Report of Investigation at 60, 62, and faults him for occasionally "abandon[ing] professional decorum," as he did in the March 2014 meeting, *id.* at 61.  Lewis also testified that her review considered several instances of poor performance, including one case in which Woodberry falsely stated that a suicidal client had agreed to a "safety contract."  *See id.* at 148.  Finally, although the Agency does not mention this

point in its briefing, the EEOC Opinion notes that two other agency officials, John Miliam and James Barry, independently verified the reasoning of the performance review.  *See id.* at 99–118; EEOC Opinion at 8.  The above evidence clearly meets the Agency's burden at the second step of *McDonnell Douglas*.  Woodberry thus bears the burden of providing "positive evidence" of retaliation beyond "mere temporal proximity."  *Iyoha*, 927 F.3d at 574.

Woodberry has not presented any evidence of that kind.  To begin, Woodberry accepts the facts underlying the Agency's submission.  He does not challenge the accuracy of the Agency's audits.  *See* Def.'s Statement of Facts ¶ 30; Pl.'s Statement of Facts ¶ 30.[5]  He agrees that he became angry and frustrated in the March 2014 meeting.  *See* Def.'s Statement of Facts ¶¶ 8–9; Pl.'s Statement of Facts ¶¶ 8–9.  He agrees that he made a false representation regarding a suicidal client.  *See* Def.'s Statement of Facts ¶ 34; Pl.'s Statement of Facts ¶ 34.  And he does not provide any reason to think that Miliam or Barry had a retaliatory motive.

Woodberry also lacks any direct evidence that Lewis had a retaliatory motive.  He does not identify any statement from Lewis that reflects retaliatory animus in any context, let alone in the context of his performance review.  *See Iyoha*, 927 F.3d at 574.  More importantly, he does not establish that Lewis even knew about the protected conduct in this case—*i.e.*, the fact that he objected to his transfer as not only inconvenient, but discriminatory.  *See* Report of Investigation at 146 (describing a conversation between Lewis and Woodberry about his transfer without any reference to discrimination).  Absent knowledge of Woodberry's protected conduct, Lewis could

---

[5]  When the Agency proffered that the "information contained in the audits is accurate," Def.'s Statement of Facts ¶ 30, Woodberry responded that he "performed objectively better than other similarly situated Treatment Specialists," Pl.'s Statement of Facts ¶ 30.  Because that response does not address the audits' accuracy, the Court treats their accuracy as conceded.

not possibly have retaliated for it.  *See Holcomb*, 433 F.3d at 903 (citing *Mitchell v.*

*Baldrige,* 759 F.2d 80, 86 (D.C. Cir. 1985)).

Finally, although Woodberry attempts to show retaliation through circumstantial

evidence, *see* Pl.'s Mem. at 25–26, he does not succeed.  First, Woodberry notes that he received

stronger performance reviews in prior years.  *See id.* at 25.  But he does not dispute that he "had

a completely new set of responsibilities" than in those years, Report of Investigation at 147–48,

which makes historical comparisons unhelpful.  Second, Woodberry alleges that Lewis

undermined him by increasing his "workload by forty-five cases in 2013," which was "four

times the workload increase" of his Caucasian colleague, Barno.  *See* Pl.'s Mem. at 25 (citation

omitted).  But by Woodberry's own account, Lewis increased his workload in 2013, long before

he engaged in his protected conduct.  Moreover, Woodberry and Barno had roughly the same

number of total cases: 118 and 107, respectively.  *See* Report of Investigation at 101.  Finally,

Woodberry argues that he "performed objectively better than Mr. Barno," who received a

stronger performance review, "based on the seventy percent (70%) program completion rate of

his clients as compared to the fourteen percent (14%) program completion rate of Mr. Barno's

clients."  *See* Pl.'s Mem. at 25 (citation omitted).  But program completion rate is only one factor

in Agency performance reviews.  *See* Report of Investigation at 59–63.  And this case does not

concern the design of those reviews as a general matter, but only whether Woodberry's 2014

performance review constituted unlawful retaliation.  *See Fischbach v. D.C. Dep't of*

*Corrections*, 86 F.3d 1180, 1183 (D.C.Cir.1996) (noting that courts review not "the correctness

or desirability of the reasons offered [for an employment action] but whether the employer

honestly believes in the reasons it offers").  Woodberry's program completion rate has nothing to

12

do with that latter question.  Thus, Woodberry lacks any "positive evidence" the reasoning in his performance review was a mere pretext for retaliation.  *Iyoha*, 927 F.3d at 574.[6]

     For the reasons above, the Court concludes that "there is no genuine dispute as to any material fact" and that the Agency is "entitled to judgment [on this issue] as a matter of law." Fed. R. Civ. P. 56(a).  The Court will accordingly grant summary judgment to the Agency on Woodberry's retaliation claim.

     **B.**     **The Hostile Work Environment Claim**

     Summary judgment is also appropriate on Woodberry's hostile work environment claim. To prevail on that claim, Woodberry must show that Agency officials "subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Because Title VII is not a "general civility code," the officials' conduct "must be [so] extreme [as] to amount to a change in the terms and conditions of employment," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted).  In addition, Woodberry "must establish that [their] allegedly harassing conduct . . . was based on a protected characteristic," or that there is "some linkage between the hostile behavior and [his] membership in a protected class." *Byrd v. Vilsack*, 931 F. Supp. 2d 27, 45 (D.D.C. 2013) (Wilkins, J.) (citing *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1123 (D.C. Cir. 2002), and *Motley–Ivey v. District of Columbia*, 923 F. Supp. 2d 222, 233 (D.D.C. Feb. 14, 2013)).  Absent that requirement, "the federal courts [would] become a court of personnel appeals." *Bryant v.*

---

[6] Given this conclusion, the Court need not address whether Woodberry exhausted his retaliation claim below.  *See Fort Bend Cty., Tex. v. Davis*, 139 S. Ct. 1843, 1850–51 (2019) (holding that Title VII's charge-filing requirement is not jurisdictional).

*Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003) (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)).

In this action, Woodberry rests his hostile work environment claim on the following incidents: (1) his Letter of Caution, (2) his transfer to the South Capitol Street location, (3) his inability to attend an important doctor's appointment in March 2014; (4) Lewis' use of profanity in September 2013; (5) Lewis' stories about her relationships; and (6) Felder and Moore's questions about Woodberry's leave. *See* Am. Compl. ¶ 37; *see also* Mem. Op. of June 5, 2020, at 11–12 (summarizing Woodberry's allegations). This Court held at the motion to dismiss stage that Woodberry's allegations were "sufficiently abusive—both subjectively and objectively—to support a hostile work environment claim." Mem. Op. of June 5, 2020, at 13. The Court also noted, however, that Woodberry will soon need "record evidence" to prove that "discrimination based on his race, color, or sex was a motivating factor for the abuse." *Id.*

Woodberry has failed to produce any evidence that the above incidents reflected unlawful discrimination based on race. *See Byrd*, 931 F. Supp. 2d at 45. Of those six incidents, only the transfer to South Capitol Street has a bona fide connection to race. The Agency admits that Felder wanted a "strong African American Male presence" at its South Capitol Street location. Def.'s Statement of Facts ¶ 19. But Felder's assessment of that location's needs does not support the inference that he discriminated against Woodberry in other respects—let alone in issuing the Letter of Caution, conducting the March 2014 meeting, or conversing with Castle. Similarly, Woodberry lacks any record evidence that could connect Felder's reason for transferring him to Lewis' reasons for using profanity or telling him about her relationships. Indeed, Woodberry admitted in his deposition that he did not believe Lewis to have discriminated based on race, only gender. *See* Pl.'s Dep. at 45. He also admitted that he did not believe Moore's conduct to

be "discriminatory."  Pl.'s Dep. at 56.  This absence of evidence is fatal to Woodberry's claim because his transfer, standing alone, is not enough to create a hostile work environment.  *See Baloch*, 550 F.3d at 1201 (requiring "severe or pervasive" conduct); *see also Forklift Sys.*, 510 U.S. at 23 (noting that the existence of a hostile work environment depends in part on "the frequency of the discriminatory conduct").

Nor has Woodberry produced any evidence that the above incidents reflected unlawful discrimination based on sex.  Woodberry testified that that Lewis' bias against men was evident when both he and Blackwell left the March 10, 2014 meeting, but only he received a written reprimand.  *See* Pl.'s Dep. at 47–48.  Yet although Blackwell did not receive a Letter of Caution, *see* Report of Investigation at 67, she was not similarly-situated to Woodberry because she was "[his] intern" at the time, Def.'s Statement of Facts ¶ 9.  *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (explaining that plaintiffs and proper comparators must have "similar[ ]" "jobs and job duties").  Woodberry also provides no evidence that Felder discriminated based on sex in issuing the Letter of Caution, conducting the March 2014 meeting, or conversing with Castle.

Woodberry has also failed to present circumstantial evidence of discrimination.  *See* Pl.'s Mem. at 13–17.  The Court has already addressed the argument that Lewis unfairly increased his workload, *see id.* at 14.  *See supra* (noting that Woodberry and Barno had similar total workloads).  The record lacks evidence that Lewis "did not use profanities toward other employees" or tell other employees about her "personal issues."  Pl.'s Mem. at 14 (citing Pl.'s Dep. at 62–71 for that proposition); *see* Pl.'s Dep. at 62–71 (not addressing that proposition).  Finally, although Woodberry argues that it was inappropriate for Lewis and Felder to keep him from his doctor's appointment and issue a Letter of Caution, *see* Pl.'s Mem. at 15–17, he does

not show that any similarly-situated co-worker was treated differently in similar circumstances. His briefing contains no other attempt at circumstantial evidence.

Woodberry's remaining argument misunderstands the legal standard for summary judgment. He writes, "all that is required of Plaintiff's amended complaint at this stage is that it provide enough factual capacity to show a plausible entitlement to relief; that is, that it contain "enough facts to [nudge] a claim to relief . . . across the line from conceivable to plausible." Pl.'s Mem. at 16 (quoting *Winston v. Clough*, 712 F. Supp. 2d 1, 13 (D.D.C. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). That is the standard for surviving a motion to dismiss, at which stage courts "assum[e] that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555. It does not apply at the summary judgment stage, which turns in part on whether the record contains a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Accordingly, contrary to Woodberry's repeated suggestions, *see* Pl.'s Mem. at 14–17, the Court will not treat unsupported allegations in his complaint as fact.[7]

For the reasons above, no reasonable jury could find that the Agency subjected Woodberry to a hostile work environment based on race, color, or sex. The Court will thus grant the Agency's motion for summary judgment on this issue.

---

[7] As above, because summary judgment is appropriate on the merits of this claim, the Court will not address whether Woodberry exhausted the claim below. *See Davis*, 139 S. Ct. at 1850–51.

**CONCLUSION**

The defendant's Motion for Summary Judgment is granted.  A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

January 28, 2022